UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| GEORGE GUINDON, BARBARA GUINDON, Individually BARBARA GUINDON, as Mother and Next Friend to ERICA GUINDON, minor; TAMMY AYER, as Guardian and Next Friend to KAYLA MARIE DOROTHY ABBENANTE AYER, minor LOUIS ROSSI, as Administrator of the Estate of JOSEPH ROSSI; CHRISTOPHER SCOT; JULIANNA GIAVEN; ERIC MALARDO; MICHELLE MALARDO; RICHARD SANETTI; PATRICIA SANETTI; PAUL AND BETTY ROE, Individually, PAUL AND BETTY ROE, as Co-Administrators of the Estate of LORI K. DURANTE; LINDA RODERIQUES, as Administratrix of the Estate of DONALD RODRIQUES; LINDA RODERIQUES Individually; LINDA RODERIQUES, as Mother and Next Friend to MANDI RODERIQUES, minor CHARLES and CAROL SWEET, as Administrators of the the Estate of SHAWN SWEET; CHARLES and CAROL SWEET, Individually, STEPHEN BRUNO, DANIEL DAVIDSON; JACINTO BOTELHO, CATHERINE CARIGNAN | : | **COMPLAINT** |
| VS. | : | |
| LEGGETT & PLATT INCORPORATED and L&P FINANCIAL SERVICES CO. | : | |

## JURISDICTION AND VENUE

1. The plaintiffs allege claims in negligence, product liability, wrongful death, and loss of consortium.

2. Jurisdiction in this Court is based upon diversity of citizenship, pursuant to 28 U.S.C. 1322(a)(1). The amount in controversy exceeds $75,000.

3. Jurisdiction in this Court may also be based upon 28 U.S.C. 1369, Multiparty Multiforum Jurisdiction.

## PARTIES

4. The plaintiff, George Guindon, is an individual who at all times relevant hereto, lived in Coventry, Rhode Island. Mr. Guindon was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

5. The plaintiff, Barbara Guindon, individually; Erica Guindon, a minor, by and through her mother and next friend, Barbara Guindon; are individuals who at all times relevant hereto lived in Coventry, Rhode Island. Mr. Guindon was an injured patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

6. The plaintiffs, Estate of Tina Marie Ayer, by and through Tammy Ayer, Administratrix; Kayla Marie Dorothy Abbenante Ayer, a minor, by and through her aunt and next friend, Tammy Ayer; are individuals who at all times relevant hereto lived in Bristol, Rhode Island. Ms. Tina Ayer was a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

7. The plaintiffs, Estate of Joseph Edward Rossi, by and through Louis Rossi, Administrator; are individuals who at all times relevant hereto lived in Pawtucket, Rhode Island. Mr. Rossi was a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club. Mr. Louis Rossi's appointment as Administrator of the plaintiff Estate by the Pawtucket Probate Court is pending.

8. The plaintiff, Christopher Scott, is an individual who at all times relevant hereto, lived in West Warwick, Rhode Island. Mr. Scott was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

9. The plaintiff, Julianna Giaven, is an individual who at all times relevant hereto, lived in West Warwick, Rhode Island. Ms. Giaven was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

10. The plaintiff, Stephen J. Bruno, is an individual who at all times relevant hereto, lived in Cranston, Rhode Island. Mr. Bruno was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

11. The plaintiff, Jacinto Botelho, is an individual who at all times relevant hereto, lived in Providence, Rhode Island. Mr. Botelho was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

12. The plaintiff, Eric Malardo, is an individual who at all times relevant hereto, lived in Coventry, Rhode Island. Mr. Malardo was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

13. The plaintiff, Michelle Malardo, is an individual who at all times relevant hereto, lived in Coventry, Rhode Island. Ms. Malardo was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

14. The plaintiff, Richard Sanetti, is an individual who at all times relevant hereto, lived in Coventry, Rhode Island. Mr. Sanetti was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

15. The plaintiff, Patricia Sanetti, is an individual who at all times relevant hereto, lived in Coventry, Rhode Island. Ms. Sanetti is the wife of Richard Sanetti who was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

16. The plaintiff, Catherine Carignan, is an individual who at all times relevant hereto, lived in Coventry, Rhode Island. Ms. Carignan was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

17. The plaintiffs, Estate of Donald Rodriques, by and through Linda Rodriques, Administrators; Linda Rodriques individually; Mandi Rodriques, a minor, by and through her father and next friend, Linda Rodriques; are individuals who at all times relevant hereto lived in Fall River, Massachusetts. Mr. Rodriques was a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club. Ms. Rodriques' appointment as Administratrix of the plaintiff Estate by the Barnstable Probate Court is pending.

18. The plaintiffs, Estate of Lori K. Durante, by and through Paul and Betty Roe, as Co-Administrators, are individuals who at all times relevant hereto lived in North Kingstown, Rhode Island. Ms. Durante was a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club. Mr. and Mrs. Roe's appointment Co-Administrators of the

plaintiff Estate by the North Kingstown Probate Court is pending.

19. The plaintiff, Daniel Davidson, is an individual who at all times relevant hereto, lived in Wyoming, Rhode Island. Mr. Davidson was injured as a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club.

20. The plaintiff, Estate of Shawn Sweet, by and through Charles and Carol Sweet, Co-Administers; is an individual who at all times relevant hereto lived in Pembrook, Massachusetts. Mr. Sweet was a patron of The Station night-club on February 20, 2003, when the building caught fire and burned to the ground following the use of pyrotechnics by a band performing within the club. Mr. and Mrs. Sweet's appointment as Co-Administrators of the plaintiff Estate by the Plymouth Probate and Family Court was granted on May 23, 2003.

## DEFENDANTS

21. Leggett & Platt Incorporated is a Missouri corporation doing business as Crest Hood Foam Company, Inc. and Crest Foam.

22. L&P Financial Services Co. is a Delaware corporation which, in conjunction with Defendant Leggett & Platt, sold foam product which injured plaintiffs.

## PROCEDURAL BACKGROUND

23. This matter was originally filed against the Defendants Leggett & Platt and L&P Financial Services in the Federal Court for the District of Rhode Island in the so-called Station Fire case Guindon, et al v. American Foam Corporation, et al C.A. No. 03-335-L; Roderiques, et al v. American Foam Corporation, et al C.A. No. 04-026L; Sweet, et al. v. American Foam Corporation, et al ,C.A. No. 04-056L.

24. That on or about September 19, 2007, the Court dismissed the above cases against Leggett & Platt and L&P Financial Services for insufficiency of service of process.

25. This matter is now re-filed under R.I.G.L. §9-1-22 which tolls the Statute of Limitations and allows for the extension of time after the termination of the action for insufficiency of service of process [1] to re-file the Complaint. [2]

---

[1] See Furtado vs. Laferriere 839 A.2d 533 2004 R.I.

[2] See Rodi vs. Southern New England School of Law 389 F. 3d 5 1st Circuit 2004.

## COUNT I
## LEGGETT & PLATT INCORPORATED - NEGLIGENCE

26. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 25 of this Complaint.

27. Leggett & Platt Incorporated is a Missouri corporation doing business as Crest Hood Foam Company, Inc. and Crest Foam.

28. Leggett & Platt designed, manufactured and/or distributed and/or sold foam product to American Foam Corporation, which product caused severe injuries and death to plaintiffs.

29. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

30. The injuries and deaths sustained by plaintiffs were the direct and proximate result of defendant's negligent breach of its duties including, but not limited to, defendant's;

A. Failure to use due care in the manufacture, sale or distribution of the foam product.

B. Failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

C. Failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

D. Failure to warn potential and actual users of the product of its potential hazards;

E. Failure to properly and adequately educate users about the use and hazards of the foam product;

F. Failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

G. Otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product;

**COUNT II**
**LEGGETT & PLATT INCORPORATED**
**STRICT LIABILITY**

31. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 25 of this Complaint;

32. The foam product sold and/or distributed by defendant Leggett & Platt was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. The requirement that Defendant Leggett & Platt adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern;

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant Leggett & Platt adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including Leggett & Platt has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufactures such as Leggett & Platt, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without ant necessary product stewardship.

1. There was a need for defendant Leggett & Platt to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. Leggett & Platt had to be satisfied that is foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

33. Defendant had actual knowledge that is foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

34. Defendant's polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

35. Defendant's polyurethane foam in questions contained a design defect that caused plaintiffs harm.

36. The Defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the Defendant Leggett & Platt Incorporated.

37. Plaintiffs had no knowledge of the defective condition of the foam product.

38. The extremely hazardous, unreasonably dangerous and defective foam in question was the proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

39. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant Leggett & Platt Incorporated.

A. The use and misuses of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. Leggett & Platt should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finished in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or sound proofing material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexile polyurethane foam and the non-flame retardant variety.

E. Defendant knew that is polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

40. If was foreseeable to defendant Leggett & Platt that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

41. If was foreseeable to defendant Leggett & Platt that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufactures such as Leggett & Platt, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

42. It was foreseeable to Leggett & Platt that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

43. The defendant's defective foam constituted an active hazard, not a passive condition.

44. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

45. But for the defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed, The Station nightclub fire would not

have occurred on February 20, 2003.

46. Defendant's foam in question was not a bulk product as would be protected by § Restatement Torts, 3rd.

47. Defendant's foam in question was not a component part but was an end product itself.

48. Defendant's foam in question was not integrated into any other product.

49. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

50. This integration and defect caused the plaintiffs harm.

51. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT III**
**LEGGETT & PLATT INCORPORATED - BREACH OF WARRANTY**

52. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 46 of this Complaint.

53. Defendant Leggett & Platt Incorporated breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

54. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT IV**
**L&P FINANCIAL SERVICES CO. - NEGLIGENCE**

55. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 54 of this Complaint.

56. L&P Financial Services Co. is a Delaware corporation which, in conjunction with Defendant Leggett & Platt, sold foam product which injured plaintiffs.

57. Defendant at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipient, and/or people coming in contact with the foam product in the design, manufacture, testing, inspecting, marketing, producing, selling and/or distributing of the foam product.

58. The injuries and death suffered by the plaintiffs were a direct and proximate result of defendant's negligence breach of its duties including but not limited to Defendant's:

A. Failure to use due care in the manufacture, sale or distribution of the foam product.

B. Failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

C. Failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

D. Failure to warn potential and actual users of the product of its potential hazards;

E. Failure to properly and adequately educate users about the use and hazards of the foam product.

F. Failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

G. Otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing, advertising, packaging, provision, distribution and/or sale of the foam product.

## COUNT V
## L&P FINANCIAL SERVICES CO. - STRICT LIABILITY

59. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 58 of this Complaint.

60. The foam product sold and/or distributed by defendant L&P Financial Services was defective and unreasonably dangerous as designed, manufacture, marketed, sold and distributed for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinary dangerous and defective flammability properties.

B. Failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

C. Failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

1. The requirement that defendant L&P Financial Services adequately and accurately warn devices, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including L&P Financial Services has recognized that certain applications and locations of use of polyurethane

foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as L&P Financial Services Co., have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for Defendant L&P Financial Services to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. L&P Financial Services had to be satisfied that is foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

61. Defendant had actual knowledge that is foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

62. Defendants' polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

63. Defendants' polyurethane foam in question contained a design defect that caused plaintiffs harm.

64. The Defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact condition chemically and flammability-wise as it was when it was manufactured and sold by the Defendant L&P Financial Services.

65. Plaintiffs had no knowledge of the defective condition of the foam product.

66. The extremely hazardous, unreasonably dangerous and defective foam in question was the proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

67. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant L&P Financial Services Co.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e, a nightclub, is a foreseeable hazard. L&P Financial Services Co. should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. They have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

68. It was foreseeable to defendant L&P Financial Services that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

69. It was foreseeable to defendant L&P Financial Services that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

70. It was foreseeable to L&P Financial Services that is defective foam would be ignited in an overcrowded nightclub with inadequate exits an other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performers, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

71. The Defendant' defective foam constituted an active hazard, not a passive condition.

72. The Defendant's defective foam was not a remote cause of the fire but was an immediate cause.

73. But for the defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed, The Station nightclub fire would have occurred on February 20, 2003.

74. Defendant's foam in question was not a bulk product as would be protected by § Restatement Torts, 3rd.

75. Defendant's foam in question was not a component part but was an end product itself.

76. Defendant's foam in question was not integrated into any other product.

77. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

78. This integration and defect caused the plaintiffs harm.

79. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT VI**
**L&P FINANCIAL SERVICES CO. - BREACH OF WARRANTY**

80. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 79 of this Complaint.

81. Defendant L&P Financial Services Co. breached express and implied warranty of

merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

82. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**WHEREFORE**, plaintiffs request that this Honorable Court:

1. Award compensatory damages against each of the defendants in an amount that this Court deems meet and just;

2. Award punitive damages against each of the defendants in an amount that this Court deems meet and just;

3. Award costs of this action including attorneys' fees to the plaintiffs;

4. Award such other and further relief as this Court may deem appropriate; and

5. Trial by jury.

Plaintiffs,
By their Attorneys,
BRIAN CUNHA & ASSOCIATES, P.C.

Brian R. Cunha, Esq.
311 Pine Street
Fall River, MA 02720
Tel: (508) 675-9500
Fax: (508) 679-6360
Reg.# 4074

Dated: 10/3/07